IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31298-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERIK RAMOS CARRASCO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. —A jury rejected the claim by Erik Carrasco, a member of the Norteño gang, that in shooting into a car occupied by five members of the rival Sureño gang, he was acting in self-defense. He was sentenced to a total term of confinement of 1,126 months for his convictions of one count of second degree murder, five counts of second degree assault, one count of illegal possession of a firearm and two gang aggravators.

He argues on appeal that the trial court erred by admitting gang evidence when there was no nexus between the crimes and gang activity, and by increasing his sentence for the gang aggravators based on inadmissible gang evidence. He also argues that the State's evidence was insufficient to support the convictions for second degree murder and first degree assault.

We find no error as to those matters or in connection with the several issues raised by Mr. Carrasco's pro se statement of additional grounds. The State's evidence was sufficient. We affirm.

FACTS AND PROCEDURAL BACKGROUND

Erik Carrasco is a member of LaRaza, a Norteño gang. In the early evening of April 28, 2010, he was walking to the market when he stopped at the home of the Cueva family on north 4th Street in Yakima to visit with his friend, Ernesto Cueva. The north side of Yakima is a territory claimed by the Norteño gang. Mr. Carrasco and Mr. Cueva were standing in the front yard, having been joined by several other acquaintances, when a green car passed carrying five passengers, all members of the rival Sureño gangs.

The few eyewitnesses who were able or willing to testify at Mr. Carrasco's criminal trial had inconsistent and in some cases diametrically different accounts of what happened next. According to Mr. Carrasco, the Sureños stopped their car at the market, where they stayed for a few minutes. Mr. Carrasco claims that several people in his group, himself included, tried to get everyone to go inside the Cueva home "in case something [did] occur." Report of Proceedings (RP) at 532.

After the Sureños came out of the market and returned to the green car, Mr. Carrasco claimed that they drove slowly down 4th Street toward the Cueva home; as they approached, they "did some yelling, screaming their hood, their names": Sureños and

2

VSL.[1] RP at 532-33. When the car passed the front yard of the Cueva home, a passenger threw a beer can, striking Mr. Carrasco in the head. Mr. Carrasco claimed that he then saw what he believed to be a gun in the hand of one of the passengers; he responded by shooting his .45 magnum three times, striking one passenger in the head and one in the left arm. The passenger who was shot in the head later died from the injury.

Mr. Carrasco ran to his nearby home and changed his clothes. He later threw his gun into the river. He was eventually arrested, however, and agreed to speak with detectives. In a recorded interview, he initially insisted that he was inside the Cueva home when he heard gunshots. But later in the interview he admitted that he was the shooter, claiming he acted in self-defense.

Storm Lopez, who had been sitting in the left rear seat of the green car, was the only victim willing or able to recount what he had seen and heard. He claimed that he and his fellow passengers did nothing to precipitate the violence and were unarmed. According to him, as they were driving on north 4th Street, he heard someone yell "let's get down," an expression meaning "let's fight," and then heard five or six gunshots. RP at 166, 174. He claimed that he ducked in response to the gunfire and did not see the shooter. *Id.*

---

[1] Varrio Sureño Locotes, a Sureño gang.

Romero Camacho, the passenger shot in the arm and who was sitting in the front passenger seat of the green car, admitted that he and the other Sureños "were on the wrong side of the hood," in Norteño territory, when the shooting occurred. RP at 217-18. But he claimed he could not remember whether there had been an altercation leading to the shooting, because he was intoxicated on beer and Xanax[2] that day and "we probably might have got into something while I was in the blackout stage." RP at 217.

Jasmine Johnson, who Mr. Carrasco said was present with him in the Cueva front yard at the time of the shooting, ultimately claimed not to recall anything about the evening of the shooting, admitting only that she provided police with a statement in July 2010 that she was in the front yard and saw Mr. Carrasco get hit with a beer can. Ernesto Cueva proved equally unhelpful, claiming he could not remember much. He would acknowledge only that maybe he saw a beer can and maybe he saw a gun, but he maintained that he was inside his home when the gunshots were fired.

The only other eyewitness to the shooting who provided information was Ricardo Vasquez, who contacted police in July 2010 and offered to tell them what he knew about the shooting in exchange for having an assault charge dropped. He claimed that he had driven past the Cueva home twice on the evening of the shooting. The first time, he saw

---

[2] Alprazolam, a prescription drug used to treat anxiety disorders and panic disorder. *See* www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html (last visited Jan. 28, 2015).

4

Mr. Carrasco, whom Mr. Vasquez knew from his own former membership in the LaRaza gang, talking with the Cueva brothers on the sidewalk. When he drove by again a short time later, he saw people jump into a green car and saw Mr. Carrasco shooting at the car as it drove away from Mr. Carrasco and toward his southbound van. As the green car passed by his van, Mr. Vasquez said that he could see that one of its windows was shot out and the passengers inside looked panicked. He said that he didn't see anyone in the car with a gun, nor did he see anything thrown from the green car.

Mr. Vasquez also claimed that some time following the crime, he encountered Mr. Carrasco when they were both serving time in juvenile detention. According to him, one day as he, Mr. Carrasco and a third detainee were walking in the yard of the juvenile detention facility, they began to talk about the April 28 shooting. According to Mr. Vasquez, Mr. Carrasco "told us, you know, that he was happy because he earned his stripe, his first stripe," which Mr. Vasquez explained was "like points you earn in a gang, like certain levels," and "the main thing . . . to really earn a stripe is to take someone's life, to kill somebody, a rival gang member." RP at 195-96. He also said that Mr. Carrasco told the two that he was concerned "some little kid" was opening his mouth and talking about what had happened, so he had "[told] some other guy . . . to check his little homey." RP at 195. He explained that when a person gets "checked," "everybody will come . . . [to] just beat you up. Then after that you're cool again, I guess. That's your discipline, I guess." RP at 197.

5

Unpersuaded by Mr. Carrasco's claim of self-defense in light of the evidence, the State charged him with second degree murder, four counts of first degree assault, and one count of second degree unlawful possession of a firearm.

Before trial, the State moved in limine to offer generalized evidence from Mr. Vasquez and Detective Drew Shaw on the importance, in gang culture, of earning and maintaining "respect," including the importance of avenging disrespect. The State also identified 13 gang-related facts it would seek to establish in support of its theory that this was a gang-motivated shooting. After hearing argument, the court ruled that the evidence identified by the State would be admitted, finding that the gang evidence was not merely relevant, but was "critical, essential and undeniably probative on the issues of motive and intent," adding that "you can't excise the gang evidence and testimony from the circumstances of this particular homicide." RP at 95. The court pointed out that even if Mr. Carrasco *did* act in self-defense, "it's still self-defense to the gang-motivated aggression of the people who he shot at." RP at 96.

The witnesses called at trial included Messrs. Lopez, Camacho, Vasquez and Cueva; Ms. Johnson; responding law enforcement officers, Detective Shaw, and numerous neighbors of the Cuevas who had heard shots and seen a young light-skinned Hispanic man running away from the apparent scene of the shooting.

In the brief defense case, Mr. Carrasco testified that after the beer can struck him in the head, he thought he saw a gun in the hands of the passenger sitting behind the

6

driver and that he was "scared for my life and the life of my friends." RP at 533. He told the jury he was carrying a gun because of prior occasions when shots had been fired at him or at his home. According to Mr. Carrasco, in pulling out his gun and shooting three times at the car, he was "just trying to scare them away. My intents were not to kill nobody." RP at 544. He stated he did not come forward and admit his involvement at the time of the shooting because he was "[s]cared, scared that I wouldn't be believed." RP at 534.

He was not believed by the jury. Rejecting his claim of self-defense, it found Mr. Carrasco guilty as charged on all counts. It returned special verdicts that he was armed with a firearm at the time he committed the crimes and committed them with a motive or intent supporting an exceptional sentence under RCW 9.94A.535(3)(aa) and (s). The court sentenced Mr. Carrasco to a total term of confinement of 1,126 months. He appeals.

## ANALYSIS

Mr. Carrasco argues that the trial court erred by admitting gang evidence absent a nexus between the crimes and gang activity and by increasing his sentence for gang aggravators that depended on inadmissible gang evidence. He also challenges the sufficiency of the State's evidence to support the convictions for second degree murder and first degree assault, arguing that the State did not disprove self-defense. We address his challenges in turn.

7

*I. The trial court did not err in admitting gang evidence*

Mr. Carrasco's first assignment of error complains only of the absence of a nexus between gang culture and his crime. But the argument section of his brief more broadly challenges the trial court's conclusion that gang evidence was admissible under ER 404(b). He argues that "the events could be, and were, explained without any reference to gang culture," since "the real facts of the matter are that Mr. Carrasco got hit on the head by a beer can, believed he saw a gun, and acted in self-defense." Br. of Appellant at 7, 9.

ER 404(b) prohibits a court from admitting "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Because it is a limitation on "*any* evidence offered to 'show the character of a person to prove the person acted in conformity' with that character at the time of a crime," it encompasses evidence of gang affiliation that a jury may perceive as showing a law breaking character. *State v. Foxhoven*, 161 Wn.2d 168, 174-75, 163 P.3d 786 (2007) (quoting *State v. Everybodytalksabout*, 145 Wn.2d 456, 466, 39 P.3d 294 (2002)). Affiliation with a gang is also protected by the First Amendment to the United States Constitution's right of association and is inadmissible to prove a defendant's beliefs and associations; because gang evidence is considered prejudicial, there must be a nexus between the crime and the gang before the affiliation is admitted. *State v. Asaeli*, 150 Wn. App. 543, 579, 208 P.3d 1136 (2009); *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009) (citing *Dawson v. Delaware*, 503 U.S. 159, 112 S. Ct. 1093, 117 L. Ed. 2d

309 (1992)). A trial court's decision to admit gang evidence under ER 404(b) is reviewed for abuse of discretion. *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995).

Before admitting evidence under ER 404(b), the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) state the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) balance the probative value of the evidence against the danger of unfair prejudice. *State v. Kilgore*, 147 Wn.2d 288, 292, 53 P.3d 974 (2002). Mr. Carrasco does not contend that the trial court failed to follow the required procedure. The court found that the gang evidence was critical and undeniably probative on the issues of motive and intent.

Courts regularly admit gang affiliation evidence where it is relevant to the motive for a crime or to prove a defendant's intent, both of which are permitted purposes for offering evidence under ER 404(b). *Scott*, 151 Wn. App. at 527; *State v. Yarbrough*, 151 Wn. App. 66, 210 P.3d 1029 (2009) (gang evidence admissible as motive); *State v Campbell*, 78 Wn. App. 813, 821, 901 P.2d 1050 (1995) (motive and intent). Mr. Carrasco's argument that the evidence was not admissible in his case proceeds from a misguided vantage point: he argues that there was no permissible purpose for the evidence given *his* contention that shooting in self-defense was his non-gang related response to being hit with a projectile and seeing the flash of a gun.

9

When considering the admissibility of evidence, we, like the trial court, are ultimately testing the *proponent's* explanation for offering the evidence. The opponent might argue, as Mr. Carrasco does here, that the State's real objective in offering the evidence was an ulterior one: to put on a trial about gangs. But all relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute, by these rules, or by other rules or regulations applicable in the courts of this state. ER 402. The State identified a purpose for the evidence that was relevant to its theory of the case. It was not required to demonstrate that the evidence was relevant to the defense theory.

The relevance of the evidence to an issue on which prior acts evidence is permitted under ER 404(b) resolves Mr. Carrasco's contention that there was an insufficient nexus between the gang evidence and the issues in the case. Only when evidence of gang membership proves no more than a defendant's abstract beliefs does its admission violate a defendant's constitutional rights of freedom of association and freedom of speech. *Dawson*, 503 U.S. at 165.

Mr. Carrasco fails to demonstrate that the trial court abused its discretion in admitting the gang evidence.

## II.    *The trial court did not err in imposing an exceptional sentence*

The jury returned special verdicts finding that Mr. Carrasco committed the crimes with the motive or intent supporting an exceptional sentence under two gang-related aggravating circumstances provided by RCW 9.94A.535(3)(aa) and RCW 9.94A.535(3)(s) of the Sentencing Reform Act of 1981, ch. 9.94A RCW. Under subsection (3)(aa), it is an aggravating factor if a defendant commits an offense "with the intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang[,] its reputation, influence, or membership." Under subsection (s), it is an aggravating factor if the defendant commits an offense "to obtain or maintain [his] membership or to advance [his] position in the hierarchy of an organization, association, or identifiable group." The trial court added 20 months to the sentence for the murder and 20 months to the sentence for each assault based on the jury's findings of the gang aggravators.

Mr. Carrasco argues that although the jury found the aggravating factors, "there was nothing to support them *in the absence of the erroneously admitted gang evidence.*" Br. of Appellant at 10 (emphasis added). We have determined that the trial court did not abuse its discretion in admitting the gang evidence.

Properly admitted evidence supports the jury's special verdict findings. Among the supporting evidence was Mr. Vasquez's testimony that after the shooting, Mr. Carrasco stated that he was happy to have earned his first stripe. Mr. Vasquez testified, "If you kill

11

somebody, you know, that's just like the highest thing you can do in a gang, you know.

That's like the main goal in a gang, you know, is just to earn as much stripes as you can,

you know. So to take out as much rival gang members as you can, it's better for the gang

because that's less of them, you know." RP at 198.

Mr. Carrasco testified similarly when cross-examined:

Q.   What does a stripe mean?
A.   It's like -- a stripe, the more you get, they're like codes of honor, get
     them for respect, to get known by your people in the neighborhood
     and just to be known by other people.
Q.   If you get a stripe it helps your reputation, correct?
A.   It does.
Q.   It helps you move up within the gang?
A.   It does.

RP at 537.

Mr. Carrasco also admitted in cross-examination that before the shooting, the Sureños

in the green car acted disrespectfully, yelling out their gang name and "fuck you, fuck your

hood." RP at 538. He acknowledged that—being a Norteño—such disrespectful acts in his

neighborhood made him angry and upset. He admitted that if someone disrespects him that

is "pretty important," and that when someone disrespects him, "action needs to be taken"—

action that in his case, he characterized as "self-defense." RP at 540-41. Mr. Carrasco

rationalized his actions by observing that the five Sureño gang members knew they were in

Norteño territory. He explained:

12

[T]hey know what part of Yakima they're at. Whether or not I was wearing my gang colors or throwing my gang signs or, you know, giving them my gang hood, they know what they're doing, what they were getting themselves into.

RP at 540.

Based on Mr. Carrasco's own admissions and the testimony of Mr. Vasquez and Detective Shaw, a reasonable juror could find that Mr. Carrasco fired shots at the passing Sureños in order to defend Norteño territory, thereby advancing his own standing and the interest of his gang.

### *III.    The evidence was sufficient*

Mr. Carrasco finally argues that the State failed to meet its burden of disproving self-defense beyond a reasonable doubt. He contends that the State did nothing to disprove his claim of self-defense other than to ask the jury to speculate that because Mr. Carrasco was a gang member, he must have been engaged in gang-on-gang violence.

Evidence is sufficient to support a conviction if a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A defendant claiming insufficiency admits the truth of all the State's evidence. *State v. Gentry*, 125 Wn.2d 570, 597, 888 P.2d 1105 (1995). Questions of credibility are left to the trier of fact and will not be overturned on appeal. *State v. Tocki*, 32 Wn. App. 457, 461, 648 P.2d 99 (1982).

A person acts in self-defense when he reasonably believes that he is about to be injured and uses no more force than necessary to prevent an offense against his person. Once a defendant offers some evidence tending to demonstrate self-defense, the burden shifts to the State to prove the absence of self-defense beyond a reasonable doubt. *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997).

The State did not have many cooperative eyewitnesses to the shooting available to testify in the trial below despite the fact that four passengers in the green car survived and, according to Mr. Carrasco, at least two individuals in his group had remained outside the Cueva home. The witnesses that the State *did* have were enough, however. Mr. Carrasco fails to address the testimony of Mr. Lopez, one of the Sureño gang members in the green car, that he and his fellow passengers were unarmed and did nothing to precipitate Mr. Carrasco's shooting. Mr. Carrasco also fails to address Mr. Vasquez's testimony that he saw Mr. Carrasco shoot at the back of the green car but saw none of the passengers throw anything or display anything that looked like a weapon. The testimony of those witnesses, if believed by the jury, was sufficient to disprove Mr. Carrasco's claim of self-defense beyond a reasonable doubt.

Beyond that, there was considerable "consciousness of guilt" evidence against Mr. Carrasco. Many residents of the neighborhood where the shooting took place testified that a person meeting Mr. Carrasco's description sprinted away after the shots were fired; Mr. Carrasco failed to come forward and, when questioned by police, initially denied any

14

involvement; he threw the gun away; and there was evidence that he put a "green light" (a directive to intimidate[3]) on two witnesses to the shooting: Ms. Johnson and Israel Lerma. Mr. Carrasco's credibility was further compromised by several key inconsistencies in his version of what had occurred.

Finally, Mr. Carrasco's own testimony might have been viewed by the jury as negating legitimate self-defense, since he admitted on cross-examination that he did not know if he saw a gun, rather he saw a "shine." RP at 546. When asked by the prosecutor, "On that date, no one ever pointed a gun at you, did they?" Mr. Carrasco answered, "not to my recollection." RP at 549. The jury had been instructed that to be lawful, the use of force in self-defense must be used "by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary." Clerk's Papers (CP) at 294.

Viewing the evidence in the light most favorable to the State, a reasonable juror could find that the State met its burden of disproving self-defense beyond a reasonable doubt.

---

[3] Mr. Carrasco testified that the term "green light" means to "get that person;" to "[s]top them from going to court or just try to get rid of them." RP at 551.

15

STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds for review (SAG), Mr. Carrasco raises five.

*Exceptional sentence.* Mr. Carrasco challenges his exceptional sentence as "not legally justified." SAG at 2. A challenge to the exceptional sentence was adequately addressed by counsel and is rejected above. It will not be reviewed again. *See* RAP 10.10(a).

*Same criminal conduct.* Mr. Carrasco contends the trial court erred by finding the offenses were not the same criminal conduct. A defendant who fails at sentencing to identify a factual dispute for the trial court's resolution and fails to request an exercise of the trial court's discretion waives the challenge to his offender score. *State v. Naillieux,* 158 Wn. App. 630, 642, 241 P.3d 1280 (2010) (citing *In Re Pers. Restraint of Shale,* 160 Wn.2d 489, 495, 158 P.3d 588 (2007)). Whether the offenses should be considered the same criminal conduct was not raised in the trial court. It will not be considered for the first time on appeal. RAP 2.5(a).

*Gang evidence.* Mr. Carrasco voices a number of complaints in the third ground raised in his SAG. Although he is not required to cite to the record in a SAG, he must inform the court of the "nature and occurrence of alleged errors." RAP 10.10(c). There is insufficient argument to address the third ground.

16

*Ineffective assistance of counsel.* Mr. Carrasco argues he was provided ineffective assistance of counsel when his trial lawyer failed to seek an exceptional sentence downward. To succeed on an ineffective assistance of counsel claim, a defendant must articulate why his lawyer's performance fell below the standard of care and how, but for his lawyer's ineffective representation, there was a reasonable probability the result of the proceeding would have been different. Mr. Carrasco appears to argue that his lawyer should have argued that the multiple offense policy resulted in a clearly excessive presumptive sentence.

Mr. Carrasco's lawyer did argue for a low-end standard range sentence. *See* RP at 50 ("We'd ask the Court to use its leniency and discretion in this matter, Your Honor, and impose the bottom of the range in Counts 1-5 and Count 6. We'd also ask the Court that it not impose any additional time for any aggravating factors, any gang factors that was voted on by the jury. . . . We'd ask Your Honor, if you'd take that into consideration and that you impose the bottom of the range so he may have possibly some life still left out of prison."). It does not appear that his trial lawyer's performance was deficient.

Even if it were, Mr. Carrasco does not show the required prejudice. The court was asked for leniency and had discretion to impose an exceptional sentence downward whether it was asked for or not. Instead, it found substantial and compelling reasons to

17

impose an exceptional sentence upward.  Mr. Carrasco fails to explain how his lawyer's articulation of a different basis for a mitigated sentence would have changed anything.

*Offender score.*  Mr. Carrasco voices a number of complaints in his fifth and final ground, dealing with his offender score.  But he fails to sufficiently identify the trial court's claimed error.  Here again, his argument is insufficient to permit review.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Brown, J.

_____
Korsmo, J.

18